# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
December 8, 2009 Session

## WESLEY EARL BROWN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-A-328    Cheryl Blackburn, Judge**

---

**No. M2008-01923-CCA-R3-PC - Filed June 22, 2010**

---

A Davidson County jury convicted the Petitioner, Wesley Earl Brown, of two counts of rape of a child and three counts of aggravated sexual battery. The trial court sentenced the Petitioner to twenty-five years for each rape conviction, to be served consecutively, and ten years for each sexual battery conviction, to be served concurrently but consecutively to the rape convictions, for a total effective sentence of sixty years. The Petitioner filed a petition for post-conviction relief claiming: (1) he received the ineffective assistance of counsel; (2) the trial court improperly instructed the jury; and (3) the trial court's sentence violated the Petitioner's constitutional right to a jury. The post-conviction court denied relief after a hearing, and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

David L. Raybin, Nashville, Tennessee, for the Appellant, Wesley Earl Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Brian Holmgren, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
#### A. Trial and Sentencing

On direct appeal, this Court set forth the following summary of the facts underlying this appeal:

The defendant's stepdaughter, D.M., FN1 who was twelve years old at the time of the trial, testified that she had lived with her grandmother for the last eight years except for a period of about a year when she lived with her mother, Tracey Davidson Brown, and the defendant at their trailer. She stated that her mother and the defendant had a son who was four years old at the time of the trial. Additionally, the victim's grandfather, Jerry Davidson, lived with the defendant and the victim's mother at the trailer.

FN1. It is the policy of this court to refer to juvenile victims of sexual offenses by their initials.

The victim testified to at least five distinct instances of sexual contact between herself and the defendant, which had occurred when she was in the fourth and fifth grades. The incident she remembered best occurred in the living room of the defendant's trailer. After Jerry Davidson left the living room, the defendant began touching her on the "inside" of her "front place" with his finger. His finger was "going around" her skin, which made her feel uncomfortable in her stomach. The incident lasted for a "few minutes." She illustrated the touching on an anatomically correct female doll, and for the record, the assistant district attorney stated, "[T]he witness has demonstrated a finger inserted between the labial lips" of the doll.

A second incident occurred in the living room at her grandmother's house when the defendant touched her on her "front private part and he was putting his finger in there and moving it around." The defendant put his hand inside her clothes. At the time, the victim was living with her mother and the defendant at their trailer, and they were visiting at her grandmother's house. She did not call out for others to come into the room because she was "scared."

The victim also recalled that the defendant touched her on the "front part of [her] privates" without putting his finger inside her. This occurred in the living room and the bedroom at the defendant's trailer. Asked what the defendant did with his hand on those occasions, the victim responded that he "move[d] it around."

On a separate occasion, the defendant had the victim touch his penis while they were in the bathroom. She demonstrated on an anatomically correct

-2-

male doll, and with an ink pen, how the defendant had her touch him on his "front part . . . [o]n his skin" when his pants were "[o]pen and down." On the doll, the victim placed the palm of her hand on the penis, and on the ink pen, she encircled the pen with her finger and thumb. Touching the defendant felt "[y]ucky" on her hand; however, she did not do anything with her hand while touching him. She stated that this happened "towards the end" of the sequence of events involving sexual contact between her and the defendant.

The victim testified that the defendant showed her television programs showing "girls with their clothes off . . . having sex." FN2 "Probably about ten" times as they were watching the programs, the defendant touched her. "A couple" of times as they watched the programs, he did not touch her. Occasionally, the defendant's male friends would also be at the house watching these programs.

> FN2. Although these movies were variously described as "pornographic" or "sexually explicit," we note that they were broadcast commercially on the "Playboy Channel." The record does not reveal whether the movies allegedly were obscene, as defined by Tennessee Code Annotated sections 39-17-901 to -920, or simply were unrated "adult" films.

The victim stated she did not tell anyone about these incidents because she was "nervous and scared." When she was eleven years old, she told her grandmother about the defendant's activities because she was "feeling bad one night" and could not go to sleep. The victim did not tell her mother what was happening because she was "embarrassed." She said the defendant began touching her when she was five and six years old and that the incidents began after her brother was born.

On cross-examination, the victim testified she could not remember what year she lived with her mother and the defendant, only that it was "a couple of years ago." She said that the incidents with the defendant happened within the last three years and that she had not seen him in a year. She did not believe that she ever told the defendant "no," and he never told her why he was doing it nor asked her if he could. On redirect, the victim stated that some of the touching happened before her brother was born, but the incidents she remembered best occurred after he was born.

Phyllis Thompson, a licensed clinical social worker with Our Kids

Center in Nashville, testified she interviewed the victim on May 15, 2001, in order to obtain her history for purposes of medical diagnosis and treatment. She said that the victim, who was ten years old at the time, "went straight in and talked about concerns related to different kinds of touching." The victim did not demonstrate any difficulty in understanding the questions being asked, and she appeared to have "adequate cognitive and developmental abilities" for a ten-year-old. Utilizing anatomically correct drawings of unclothed children, the victim told Thompson that she was "concerned about her bottom," which she indicated on the drawings meant her genital area. The victim said the defendant had "touched that area with his hand on the skin and that it hurt." She said that the defendant "touched her butt one time, both inside and outside," and once had her touch his penis.

Sue Ross, a pediatric nurse practitioner at Our Kids Center, testified she examined the victim on May 15, 2001. While obtaining the victim's medical history from her grandmother, Ross discovered that the victim had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). Ross conducted a genital examination, during which the victim was cooperative but "very, very anxious." Ross did not observe any abnormal or unusual findings during the examination. On cross-examination, she stated that rarely would physical evidence of digital penetration be visible. Her examination revealed that the victim's anal and vaginal areas were "totally normal." On redirect, she stated that there could be digital penetration of the labia, moving "[b]ackwards, forwards, up, down," and still not be any sign of injury.

Tracey Dawn Davidson Brown, the victim's mother and the defendant's wife, testified she and the defendant had been married for almost five years but were separated at the time of trial. She and the defendant had a four-year-old son. The victim had lived with the victim's grandmother since she was four years old because Mrs. Brown had some "health issues." The victim stayed with the Browns "occasionally on weekends" and lived with them for about four months during the summer of 2000. Mrs. Brown never observed any inappropriate sexual behavior between the defendant and the victim and was never made aware of any such contact. She said that as they "would be flipping through [satellite television] channels . . . the [defendant] would stop at [an adult] channel and thought it was funny and would try and get [the victim's] attention long enough for her to glance at it." Mrs. Brown would "yell, tell [the defendant] to change the channel [and] tell [the victim] not to look at it." To try and get the victim to watch the program, the defendant "would say: 'Hey, [D.M.], look, look at the TV, look.' []. She agreed that the

-4-

incidents involving the defendant and the victim probably occurred between October 1999 and January 2001. There were times when the victim seemed afraid of the defendant.

Robert Samuel Barnes, an inmate at the Davidson County Jail, testified that the defendant, while in custody, admitted to Barnes that he had sexual relations with his stepdaughter, saying that she was ten years old at the time. Barnes said he volunteered this information to the police. He also admitted to having been convicted of burglary, criminal simulation, theft, and a bomb threat.

April Lynette Carson testified that she had been a friend of the victim's mother for about three years and had lived in the same neighborhood. She said she was present at the defendant's home when he exposed the victim to pornographic television programs several times. The defendant told the victim to look at what was on the television, and she and Mrs. Brown told him to turn it off, which he did. She stated that the defendant "talked mean" to the victim, and they "did not get along at all."

Laura Davidson, the victim's grandmother, testified that the victim had been living with her for nine years. In the summer of 2000, she let the victim move in with her mother to see if it would work out; however, it did not. The victim was diagnosed with ADHD when she was five and had received medication and treatment for it. In April 2001, Mrs. Davidson contacted the Department of Social Services after the victim told her that the defendant had been touching her "inappropriately," which the victim later described as the defendant "putting his fingers in her vagina and her rectum." About a week before this disclosure, the victim was taken to the hospital, while spending the night with her mother and the defendant, because she was having an anxiety attack. Subsequently, the victim began getting "real anxious" at bedtime, and she finally disclosed the sexual abuse to her grandmother. The victim asked her grandmother to promise not to tell anyone because she thought that her mother would not love her if she found out.

Detective David Zoccola of the Metropolitan Nashville Police Department testified regarding his investigation of the victim's case. He had worked in the youth services division for about five years, and the victim's case was assigned to him after the initial report was made to the Department of Children's Services.

The defendant elected not to testify or present any proof.

*State v. Brown*, No. M2003-02804-CCA-R3-CD, 2005 WL1412088, at *1-4 (Tenn. Crim. App., at Nashville, June 16, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). Based upon this evidence the Petitioner was convicted of two counts of rape of a child and three counts of aggravated sexual battery. The trial court imposed a sentence of twenty-five years for each rape of a child conviction, to be served consecutively, and ten years for each aggravated sexual battery conviction, to be served concurrently to each other but consecutively to the rape of a child convictions for an effective sentence of sixty years. On appeal, this Court affirmed both the convictions and the effective sentence. *Id*. at *14.

## B. Post-Conviction

The Petitioner filed a petition for post-conviction relief and amended petitions claiming that he received the ineffective assistance of counsel at trial and that the trial court sentenced him in violation of his constitutional right to a jury. The post-conviction court held an evidentiary hearing where the following evidence was introduced:

Byron Grissom, Director of Records Management for the Davidson County Sheriff's Office, testified that records documenting the Petitioner's visitors while incarcerated indicated that the Petitioner's trial counsel ("Counsel") visited with the Petitioner on August 6, 2002, for one hour; on April 20, 2003, for forty-five minutes; and on April 27, 2003, for forty-five minutes. Grissom agreed that the records would not reflect any meetings that may have occurred outside the jail, such as those occurring at court facilities. Grissom clarified that the Petitioner had been released from jail at one point and then returned. Any meetings with Counsel during the time of release would not have been recorded.

Jodie Bell testified that she was appointed to represent the Petitioner on appeal in November 2003. Bell recalled she represented the Petitioner during his direct appeal, and she raised a sentencing issue based on *Blakely v. Washington*, 542 U.S. 296 (2004), a recently published case at the time. Based on *Blakely*, she appealed the length of the Petitioner's sentence but not the trial court's impositionof consecutive sentencing. She explained that, at the time she filed the petition, she did not feel there was a legal basis for raising *Blakely* as authority for challenging consecutive sentencing.

Jerry Davidson, the victim's grandfather, testified that no police officer or attorney interviewed him for the case against the Petitioner. Mr. Davidson stated that he lived with the Petitioner, his daughter, and the victim for two or three years prior to the Petitioner's arrest in this case. Mr. Davidson testified that he never saw the Petitioner sexually abuse or mistreat the victim, although he did witness the Petitioner argue with the victim. Mr.

Davidson testified that he did not attend any of the legal proceedings in connection with this case and that he did not feel that he had any important information to provide in this case. Mr. Davidson said that he was a truck driver, a position that frequently required him to travel out of town, and he estimated that he was away from the home approximately thirty or forty percent of the time. Mr. Davidson also acknowledged that he was aware of instances of domestic violence between the Petitioner and his daughter.

Loretta Roberts, the Petitioner's sister, testified that, initially, a public defender represented her brother on these charges until the family made the decision to hire private counsel. Roberts explained that, because she had no experience with attorneys, she selected an attorney that the family could afford from the Yellow Pages. Roberts said she initially met with Counsel, paid him, and then never spoke with him again, although she thought her husband talked to him once after leaving several messages for Counsel. Roberts recalled that the Petitioner requested she try to contact Counsel because the Petitioner could not place a collect call to Counsel's office from the jail and because Counsel did not respond to letters the Petitioner had written to Counsel. Roberts said that she did not testify at the sentencing hearing because she was not asked to testify and that Counsel did not interview any of the family members as possible witnesses in this case. Roberts acknowledged that the Petitioner and the victim did not "get along," but she was unaware of any sexual abuse.

On cross-examination, Roberts testified that the Petitioner loved children and that she had never seen the Petitioner mistreat any child. Roberts was aware domestic violence had occurred between the Petitioner and the victim's mother and that the victim may have witnessed this violence.

Tracey Davidson, the victim's mother, testified that when the victim was approximately two or two-and-a-half, the victim had a nightmare and was crying hysterically. Ms. Davidson's mother said, "[S]omebody has done something to this baby, something is wrong with her." They were able to calm the victim, and the victim went back to sleep. While Ms. Davidson was at work the following day the victim told Ms. Davidson's mother that her paternal grandmother "had hurt her bottom or touched her bottom." Ms. Davidson took the victim to the doctor and was told there was no indication of sexual abuse.

Ms. Davidson testified that at age five or six the victim began taking medication for bipolar disorder. Ms. Davidson described the victim's behavior that led to the diagnosis as "temper tantrums that were real scary." Ms. Davidson agreed that, on different occasions, the Petitioner fought with both herself and the victim. On several occasions the Petitioner became physically abusive with Ms. Davidson, and the victim was present on at least one of these occasions.

Ms. Davidson stated that Counsel never interviewed her.

Counsel testified that he had handled two or three child sex abuse cases at the time the Petitioner's family retained him. Counsel reviewed his file in the hearing and agreed that there were two letters of correspondence from him to the Petitioner, but Counsel was not certain whether there might be more correspondence on his computer that was not in the file. Counsel testified that he interviewed the victim but that he did not find any notes in his file related to the interview. Counsel testified that his defense strategy was to attack the credibility of the State's witnesses. Counsel recalled that the weekend before trial he provided the Petitioner with a list of approximately thirty questions that Counsel might ask in the event the Petitioner chose to testify at trial. Counsel said that, before trial he understood that the Petitioner wanted to testify but that, at the close of the State's proof, he advised the Petitioner not to testify. Counsel stated, "He knew he had every right to do so, but he chose to take my advice." Counsel said that he believed the Petitioner would have made a poor witness.

Counsel agreed that a letter he sent to the Petitioner summarizing plea negotiations addressed the Petitioner as "Richard" rather than his correct name. Counsel denied any knowledge that the Petitioner complained about communication with Counsel and stated, "I feel like I talked to [the Petitioner] about this case as much as we could have talked about it."

Counsel was asked about the fact that the victim's grandmother had suggested that the victim said that a schoolmate grabbed her "in her private area." Counsel agreed that he did not interview the grandmother regarding this allegation but said he looked into whether there were any Department of Children's Services ("DCS") investigations surrounding the complaint and found none. Counsel also acknowledged that he never interviewed Mr. Davidson, the victim's grandfather, explaining that he did not do so based on information he had from other family members, discovery, and the Petitioner. In Counsel's opinion, Mr. Davidson did not have anything to add that would have been helpful to the Petitioner's case.

On cross-examination, Counsel testified that neither his interview with the victim nor the materials he received in discovery indicated the victim was incompetent to testify. Counsel said that he filed a motion in limine to exclude testimony from mental health professionals that would have corroborated the fact that the victim suffered some type of traumatic injury due to sexual abuse. Counsel said his file also contained notes on various legal issues and case law he researched in connection with the Petitioner's case.

Counsel testified that, in discussions with the Petitioner about whether he would testify, Counsel explained the implications of the admission of additional evidence, including evidence of the domestic violence or pornography being displayed to the victim. Counsel

recalled that the substance of Petitioner's testimony would have been a denial. Counsel testified that there was not any credible evidence to support a motive for the victim to falsely accuse the Petitioner. Counsel recalled that the Petitioner told a detective in this case that he and the victim got along well and he knew of no reason why the victim would falsely accuse him. Counsel stated that he could not "think of a defense that I could have put on for [the Petitioner] any different than what we did."

The Petitioner testified that he had a ninth grade education and that his only criminal record was an assault charge for which he was not convicted. The Petitioner testified that he met Ms. Davidson in 1995, and, in 2000, he moved into a trailer with Ms. Davidson, her father, and the victim. The Petitioner was aware that the victim had been to see psychiatrists. The Petitioner denied he sexually abused the victim but acknowledged that he had committed acts of domestic violence against Ms. Davidson and that the victim had witnessed these acts.

The Petitioner said he and Ms. Davidson have a son together, and the Petitioner believed that the victim was jealous of this child. The Petitioner recalled that the victim lived part of the time with her grandmother but stayed at the trailer two or three weekends a month. The Petitioner testified that most of the time he was around the victim Ms. Davidson was present. The Petitioner acknowledged that he watched the Playboy channel and that the victim could have been in the room while he was watching, but he said he did not purposefully sit her down to watch it.

About the Petitioner's meetings with Counsel, he stated that he was never released on bond during his incarceration for these charges. The Petitioner recalled meeting with Counsel in the holding cells at the courthouse in addition to the times Counsel met with him at the jail and the conversations at both locations were about the State's settlement offers, not the case. The Petitioner recalled that, after he refused the State's offer the night before trial, Counsel said that they needed to figure out a defense and that they concluded that the defense strategy would be that the Petitioner "didn't do it" because that was "the only defense at the time."

The Petitioner denied ever receiving a list of questions from Counsel that Counsel would have asked the Petitioner if he had testified at trial. The Petitioner also denied ever knowing that Counsel interviewed the victim. The Petitioner said he wanted to discuss a defense with Counsel, but Counsel did not respond to the Petitioner's letters. The Petitioner said that he wanted to testify at trial and tell the jury he did not sexually abuse the victim but that he chose not to testify because Counsel had not prepared him to testify.

On cross-examination, the Petitioner acknowledged that he did not propose a defense to either the public defender who initially represented him or Counsel, other than maintaining

his innocence. The Petitioner also agreed that Counsel argued at trial that the Petitioner did not sexually assault the victim. The Petitioner stated that he did not know of any other evidence that could have been presented to substantiate his defense. The Petitioner agreed that essentially his testimony would have been a denial of the abuse and that all contrary testimony presented at trial was a lie.

At the conclusion of the hearing, the post-conviction court took the petition under advisement and later issued an order denying post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner contends Counsel failed to provide effective assistance at trial, the trial court improperly instructed the jury, and the trial court improperly imposed consecutive sentences in violation of the Petitioner's right to a jury trial. The State responds that Counsel's performance was not deficient, that the trial court properly instructed the jury, and that the imposition of consecutive sentencing is consistent with controlling authority.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State,* 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State,* 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 457 (Tenn. 2001).

### A. Ineffective Assistance of Counsel

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d

453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish

unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### 1. Failure to Investigate or Call Witnesses

The Petitioner's first complaint about Counsel's performance is that Counsel failed to investigate and call potential witnesses. Specifically, he names the victim's grandfather, Jerry Davidson, and character witnesses such as the Petitioner's sister, Loretta Roberts. As to Mr. Davidson, Counsel testified that he did not interview Mr. Davidson based on information from other family members, discovery, and the Petitioner. Counsel said that Mr. Davidson would not have added anything to the Petitioner's case. Mr. Davidson himself testified that he did not attend any of the proceedings and believed he had nothing to add to the Petitioner's case. Whereas Mr. Davidson testified at the post-conviction hearing that he never witnessed any sexual abuse between the Petitioner and the victim, he also testified that he was away from the residence with his work thirty to forty percent of the time. The post-conviction court found Counsel's testimony credible and that Counsel made a tactical decision as to Jerry Davidson. The Court further found, after hearing Mr. Davidson's testimony, that it did "not pertain to the charged offenses and would not have changed the outcome of the trial."

Loretta Roberts, the Defendant's sister, testified that she retained Counsel but that Counsel never interviewed her as a potential witness. Roberts acknowledged that she did not witness the events that were the subject of the trial but that she could testify that the Petitioner loved children and that she had never witnessed him mistreat any child. Roberts admitted that she was aware of incidents of domestic violence in the home. Counsel testified that because all Roberts could testify to was the Petitioner's character, he did not feel it would benefit or impact the case in any way. The post-conviction court found Counsel's testimony to be credible and found that the Petitioner had not demonstrated by clear and convincing evidence that Counsel's tactical decision to not call character witnesses rose to the level of ineffective assistance or that it prejudiced the Petitioner.

-12-

Based upon the foregoing, we do not find that the evidence preponderates against the trial court's findings or that the Petitioner has proven by clear and convincing evidence that he was prejudiced by Counsel's failure to interview or call Jerry Davidson or Loretta Roberts as witnesses. The Petitioner is not entitled to relief as to this issue.

## 2. Communication with Client

Next, the Petitioner asserts that Counsel failed to effectively communicate with him regarding the case. The visitor log for the jail documented three visits from Counsel with Petitioner for at least forty-five minutes each. In addition to those meetings, the Petitioner said that he met with Counsel at the courthouse. The Petitioner testified that he had difficulty communicating with Counsel and asked his family to contact Counsel for him. Counsel testified that he had no knowledge of complaints regarding his contact with the Petitioner and that he "talked to [the Petitioner] about this case as much as we could have talked about it." The post-conviction court credited Counsel's testimony and found that Petitioner failed to show that the number of meetings with Counsel was so deficient as to constitute ineffective assistance of counsel. The evidence does not preponderate against the trial court's findings and thus, we conclude that this issue is without merit.

## 3. Failure to Prepare a Defense

The Petitioner contends that Counsel did not prepare a defense. Counsel testified that his defense strategy was to attack the credibility of the State's witnesses and to assert that the State had not met its burden of proof. Counsel stated that he could not "think of a defense that I could have put on for [the Petitioner] any different than what we did." The Petitioner testified that he did not propose a defense other than that he did not sexually abuse the victim and that Counsel made this argument at trial. The Petitioner stated that he knew of no other evidence that could have been presented at trial to support his defense. Based upon our review of the evidence, we cannot conclude that the Petitioner has met his burden of showing, by clear and convincing evidence, that Counsel's performance was deficient in developing a defense for Petitioner at trial. Counsel developed a strategy incorporating the Petitioner's position that he did not commit the alleged acts and followed that course during the trial. This strategy's failure to secure an acquittal does not equate with deficient performance by Counsel. *See House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief as to this issue.

## 4. Advising the Petitioner not to Testify at Trial

Petitioner asserts that Counsel was ineffective for advising the Petitioner not to testify at trial. The Petitioner does not allege that Counsel prevented him from testifying; rather, he

claims that he chose not to testify because Counsel did not prepare him to testify at trial. The post-conviction court found Counsel's testimony credible as to this issue, and further noted that "during Petitioner's trial the Court conducted a hearing pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), advising Petitioner of his right to testify and Petitioner elected to waive his right, executing the *Momon* waiver."

The record contains a waiver, signed by the Petitioner, of his right to testify. Counsel testified that he provided the Petitioner with a list of questions Counsel would ask if the Petitioner testified at trial. Counsel discussed the possible ramifications of the Petitioner testifying, such as giving the prosecution the opportunity to discuss domestic violence occurring in the home, the display of pornography to the victim, and testimony from inmates regarding admissions made by the Petitioner. If the Petitioner had testified, he said he would have denied the allegations and maintained his innocence. After evaluating what the Petitioner's testimony would add to the case versus the potential harm of the Petitioner taking the stand, Counsel advised the Petitioner not to testify. Counsel stated, "[The Petitioner] knew he had every right to do so, but he chose [to] take my advice." Based upon this evidence, we conclude that Counsel's advice to the Petitioner regarding whether or not to testify was not the deficient performance required for an affirmative showing of the ineffective assistance of counsel. Thus, we conclude that the evidence in the record does not preponderate against the post-conviction court's finding.

### 5. Mental Health and School Records

The Petitioner next asserts that Counsel failed "to address the fundamental psychological problems associated" with the victim. Based upon post-conviction counsel's request, the post-conviction court subpoenaed copies of the victim's records. In the order following the post-conviction hearing, the post-conviction court determined there were no school records containing exculpatory information. The post-conviction court reiterated its statement from an earlier order that "there are a few pages [contained in the medical records] from 1999 and 2002 that this Court may have provided trial counsel had the records been requested at that time." The post-conviction court went on to say that it "did not necessarily find the excerpts to be exculpatory; rather, the Court provided any documents referencing the sexual abuse charged in this case or which may have been remotely relevant."

After reviewing the documents, we note that the majority of the documents reference symptoms the victim was experiencing due to the sexual abuse and that one document references an incident in which the Petitioner told the victim to "'pull [her] pants down real fast. He pretended to ignore her." The documents also reference the victim's mental health diagnoses. Counsel explained that in interviewing the witness and reviewing discovery, there was nothing that indicated that the victim was not competent. He further testified that he

filed a motion in limine to prevent testimony from mental health professionals that would have corroborated the fact that the victim suffered from symptoms due to sexual abuse.

We conclude that the evidence does not preponderate against the post-conviction court's finding that the Petitioner was not prejudiced by Counsel's alleged deficiency. The post-conviction court said it would only have released a few of the medical records, and, of the few documents the trial court "may have" released to the parties, most of those referenced the symptoms suffered by the victim due to sexual abuse, which was exactly what Counsel sought to exclude through his motion in limine. Counsel explained this strategy as an effort to avoid further confirming the victim's allegations with testimony from medical professionals. The documents referenced the victim's mental health diagnoses; however, the medications and one of the diagnoses was raised at trial by three different witnesses and Counsel cross-examined one of the witnesses on this diagnosis and the medications prescribed to the victim. The Petitioner has failed to show how the single document referencing the victim's asking the Petitioner quickly to pull down her pants prejudiced the Petitioner; therefore, we find the Petitioner is not entitled to relief as to this issue.

### 6. Discrepancies Between Initial Charges and Later Election of Offenses

The Petitioner claims that Counsel was ineffective for failing to point out discrepancies between the initial charges in the indictment and the State's election of offenses.

Counsel filed a motion for a Bill of Particulars, and the State answered December 10, 2002, well in advance of the Petitioner's trial. The only variation between the Bill of Particulars and the election of offenses is that count two alleged the Petitioner's residence rather than the maternal grandmother's residence. The Petitioner argues that Counsel should have used this information against the State through cross-examination of state witnesses. The Bill of Particulars and the election of offenses, however, are not evidence or a statement made by a witness or party that could be used for that purpose. We conclude that the Petitioner has failed to show that Counsel's performance was deficient or that he was prejudiced by Counsel's conduct. Thus, the Petitioner is not entitled to relief as to this issue.

### B. Jury Instructions

The Petitioner argues that the trial court's inclusion of "reckless conduct" as an element of child rape violated his constitutional rights and that the use of the disjunctive "or" in determining the mens rea for this crime prevented a unanimous jury verdict. Further, he asserts that Counsel was ineffective for failing to object to the jury instructions.

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987) (quoting *Strady v. State*, 45 Tenn. 300, 307 (1868))). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is de novo, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

Generally, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id*. (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998)

Rape of a child requires "the unlawful sexual penetration of a victim by the defendant . . . if such victim is less than thirteen (13) years of age." T.C.A. § 39-13-522 (1997). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body, but emission of semen is not required." T.C.A. § 39-13-501(7) (1997). Because the statutory definition of rape of a child does not plainly

dispense with a mental element, "intentional," "knowing," or "reckless" conduct suffices to establish the culpable mental state. T.C.A. § 39-11-301(c) (1997); *see State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034 (Tenn. Crim. App. at Nashville, Nov. 30, 2004) (holding that, when considering the crime of rape of a child, a jury can find the defendant guilty by determining the defendant acted intentionally, knowingly, or recklessly when he unlawfully sexually penetrated the victim and with respect to the element that the victim is age thirteen or younger), *perm. app. denied* (Tenn. Mar. 21, 2005); *see also State v. Thomas D. Stricklin*, No. M2005-02911-CCA-R3-CD, 2007 WL 1028535, at * 15-18 (Tenn.Crim.App., at Nashville, Apr. 5, 2007), *perm. app. denied* (Tenn. Aug. 20, 2007). Moreover, the Committee on Pattern Jury Instructions "is of the opinion that the definitions of 'intentionally,' 'knowingly,' and 'recklessly' should all be charged for [the] offense [of rape of a child]." Comm. Pattern Jury Instructions Comments to 10.12. Thus, each element of rape of a child may be met by proving the defendant acted intentionally, knowingly, or recklessly.

In the case under submission, the trial court provided the jury the following instructions on rape of a child:

Counts 1 and 2: Rape of a child.

Any person who commits the offense of rape of a child is guilty of a crime. For you to find the defendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that the defendant had unlawful sexual penetration of the alleged victim. And, two, that the alleged victim was less than thirteen years of age. And, three, that the defendant acted either intentionally, knowingly, or recklessly. . . . .

A person acts intentionally when that person acts with a conscious objective or desire to engage in particular conduct.

A person acts knowingly if that person acts with an awareness: One, that his or her conduct is of a particular nature. And, two, that a particular circumstance exists.

A person acts recklessly if that person is aware of but consciously disregards a substantial and unjustifiable risk that a particular circumstance exists.

We conclude that the trial court properly instructed the jury with respect to the mens rea required for rape of a child. As previously stated, recklessness is acceptable as a mental state

for rape of a child, and the trial court instructed the jury accordingly. The Petitioner is not entitled to relief on this issue.

Based upon our conclusion that the trial court properly instructed the jury, we cannot conclude that the Petitioner has proven that Counsel was ineffective for not objecting to jury instructions on which Counsel had no basis to object. Thus, the Petitioner is not entitled to relief as to this issue.

### C. The Imposition of Consecutive Sentencing

The Petitioner asserts that the imposition of consecutive sentencing based upon factors not found by the jury violates his right to a jury trial. The Petitioner goes on, however, to concede that both the United States Supreme Court and the Tennessee Supreme Court have held that the Sixth Amendment does not require that facts necessary for the imposition of consecutive sentence be determined by a jury. *Oregon v. Ice*, — U.S. — , 129 S. Ct. 711, 714-15 (2009); *State v. Allen*, 259 S.W.3d 671, 689-90 (Tenn. 2008). The Petitioner explains that he makes this argument despite the case law, in case this "view be altered."

Because at this time *Ice* and *Allen* remain the controlling law on the issue of judge-found facts for consecutive sentencing, we conclude the imposition of consecutive sentencing in this case does not violate the Petitioner's right to a jury trial. He is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the Petitioner received the effective assistance of counsel at his trial, that the trial court properly instructed the jury, and that the imposition of consecutive sentencing did not violate the Petitioner's right to a jury trial. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE